655-07/GMV/SL
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
CROLIER SHIPPING LTD
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Gina M. Venezia (GV 1551)



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

**08 CV 0053 1**

CROLIER SHIPPING LTD,

**08 Civ _____ (___)**

                              Plaintiff,

        -against-                                        **VERIFIED COMPLAINT**

ATLANTIC ORIENT LINE LTD,

                              Defendant.

------------------------------------------------------------x

        Plaintiff, CROLIER SHIPPING LTD (hereinafter "CROLIER") for its Verified

Complaint against Defendant ATLANTIC ORIENT LINE LTD (hereinafter "ATOR") alleges

upon information and belief as follows:

        1.        This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of charter party.  This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C.

§1331 in that the action arises under the New York Convention on the Recognition and

Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Federal

Arbitration Act, 9 U.S.C. §1 *et seq.*

2.      At all times material hereto, Plaintiff CROLIER was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 1 Costakis Pantelides Avenue, P.O. Box 22313, Nicosia, Cyprus – 1010.

3.      At all times relevant hereto, Defendant ATOR was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 170 Old Bakery Street, Valetta, Malta.

4.      On or about October 16, 2007, Plaintiff CROLIER, as owner of the M/V EAGLE, entered into a maritime contract of charter party with Defendant ATOR, as charterer, for one time charter trip pursuant to the terms set out therein. (Attached hereto as **Ex. A** is a copy of the charter party).

5.      Under the charter, Defendant ATOR was required to pay hire at the rate of $32,500 per day pro rata.

6.      Plaintiff CROLIER duly tendered the vessel into the service of Defendant ATOR and fully performed its obligations as required under the charter.

7.      The M/V EAGLE was in the service of Defendant ATOR for 46.527778 days. At the hire rate payable under the charter, a total of $1,512,152.78 was earned by and due to Plaintiff CROLIER.

8.      At the conclusion of the charter period, Plaintiff CROLIER submitted a final hire statement to Defendant ATOR showing a balance due in Plaintiff's favor in the amount of $430,744.57. (Attached hereto as **Ex. B** is a copy of the final hire statement).

9.      In breach of the charter, and despite due demand, Defendant ATOR has refused and/or otherwise failed to pay a balance of hire due to Plaintiff CROLIER in the amount of $430,744.57, the entire amount of which remains due and outstanding under the charter.

10.    The charter party provides for the application of English law and disputes between the parties to be resolved by arbitration in London, and Plaintiff CROLIER specifically reserves its right to arbitrate the substantive matters at issue. Arbitration has been commenced.

11.    This action is brought *inter alia* pursuant to 9 U.S.C. §8 in order to obtain security for Plaintiff CROLIER's claims made in arbitration in London, England, under English law, as agreed by the parties.

12.    As provided for by English law and arbitration, attorneys fees are awarded to the successful litigant, along with costs, disbursements, the cost of the arbitration, and interest, all of which constitutes a part of the Plaintiff's main claim and the amount sued for herein. (*See* **Exh. C**, attached hereto: Declaration of Adrian Chadwick at ¶ 4).

29.    Plaintiff CROLIER estimates, as nearly as can presently be computed, that the legal expenses and costs of prosecuting its claims in London arbitration will be USD $51,337.72 and the accrued legal expenses and costs are USD $19,128.93. (See **Exh. C** at ¶¶ 5 – 8).

30.    Interest anticipated to be awarded is estimated to be $91,924.16 (calculated at the rate of 6.5% per annum compounded quarterly for a period of 3 years, the estimated time for completion of the proceedings in London). (See **Exh. C** at ¶ 9).

31.    In all, the claim for which Plaintiff CROLIER sues in this action, as near as presently may be estimated, totals **$593,135.38**, no part of which has been paid by Defendant ATOR. Plaintiff CROLIER specifically reserves its right to amend this figure and to seek an increase in the amount of security should such sum appear to be insufficient to fully secure Plaintiff CROLIER.

**Request for Rule B Relief**

31.    Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff believes that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant ATLANTIC ORIENT LINE LTD (collectively hereinafter, "ASSETS"), including but not limited to "ASSETS" at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

32.    The total amount sought to be attached pursuant to the above is **$593,135.38**.

WHEREFORE, Plaintiff CROLIER SHIPPING LTD prays:

a.    That process in due form of law according to the practice of this Court may issue against Defendant citing it to appear and answer the foregoing;

b.    That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including **$593,135.38** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due, held or being transferred to or for the benefit of Defendant ATLANTIC ORIENT LINE LTD (collectively "ASSETS"), including but not limited to such "ASSETS" as may be held, received or transferred for its

benefit at, moving through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.      That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to the recognition and enforcement of any award entered against the Defendant in the London proceedings; and

d.      For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
      January 3, 2008

               FREEHILL HOGAN & MAHAR, LLP
               Attorneys for Plaintiff
               CROLIER SHIPPING LTD

               By: _____
                    Gina M. Venezia (GV 1551)
                    80 Pine Street
                    New York, NY 10005
                    (212) 425-1900 (telephone)
                    (212) 425-1901 (fax)

## ATTORNEY VERIFICATION

State of New York    )
                     ) ss.:
County of New York  )

GINA M. VENEZIA, being duly sworn, deposes and says as follows:

1.      I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.      The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Gina M. Venezia

Sworn to before me this
3rd day of January 2008

_____
Notary Public

MELISSA COLFORD
Commissioner of Deeds
City of New York-No. 5-1692
Certificate Filed in New York
Commission Expires 4/1/ 08

# Exhibit A

TAB 1

```
|FROM: oino@kakoulidis.gr
|DATE: Mon, 16 Oct 2006 18:18:42 +0300
|SUBJECT:


FM: P.K.KAKOULIDIS SHIPPING CO LTD - 97 Akti Miaouli
185 38 Piraeus-Greece - Tel 30-210 4290610 - Fax 30-210
4290405
Telex 212887 OINO GR - E-Mail oino@kakoulidis.gr
16 Oct 2006/18:17-TK Ref: 58176


 eagle

fixture recap

subject to chrts reconfirmation to be lifted at 22:00
German time 16ᵗʰ of Oct 2006
```

subject to chrts reconfirmation to be lifted at 22:00
German time 16th of Oct 2006

```
all negotiations and enventual fixture to be kept fully
private and confidential between all parties

MV EAGLE/1985
SUMMER SW DWT 52,025MT/12.12M/TPC 54.973
TROPICAL  DWT 53,418.96MT/12.373M/TPC 55.188
WINTER    DWT 50,634.83MT/11.867M/TPC 54.749
GEARLESS TYPE,SELF TRIMMING BULK CARRIER/STRENGTHENED FOR
HEAVY CARGOES,CARGO HOLDS 2 AND 4 MAY BE EMPTY/CO2 FTD
5 HOLDS/5 HATCHES (MACGREGOR-HYDRAULIC 19,97 X 15,15 MTS)
GRAIN TOTAL 62,536.00 CBM/58.323 CBM
HOLDWISE GR/BL BREAKDOWN
HO1    11.486,3/10.687
HO2    12.959,4/12.075
HO3    12.957,8/12.079
HO4    12.946,8/12.092
HO5    12.185,8/11.390
GRT/NRT 29.905.00/18.460.00
LOA/BM 200.10/32.20MTRS/CYPRUS FLAG


SPEED/CONSUMPTION UNDER GOOD WEATHER CONDITIONS UP TO MAX
3B SEA STATE 2D ABT 12.0 KNOTS ON ABT 27 MTS IFO (180 CST)
PLUS NO MGO AT SEA ALWAYS BASIS GOOD WEATHER CONDITIONS
ALTERNATIVELY PLUS ABT 2 MTS MGO AT SEA.
VSL USES MGO IN PORT, WHEN MANEUVERING IN RESTRICTED
WATERS, ENTERING/LEAVING PORTS, SHALLOW/NARROW WATERS,
CONGESTED WATERS AND RIVERS, CANALS, WATERWAYS ETC. IN PORT
```

IDLE : ABT2.0 MGO / 24 HRS IN
PORT STANDING-BY : ABT 0.5 IFO PLUS 2.0 MGO / 24 HRS DURING
MANEUVERING
: ABT 1.1 MTS MGO / HR ALL ABOVE ABOUT WITHOUT GUARANTEE.


Owners to guarantee 45000 mt intake of blk corn st 48' pt
basis arrival draft
11,00 metres salt water at libya

For

- acct: Atlantic Orient Line, Valetta, Malta

- dely wwr nola or dolsp south west passage in chopt

- 18/23 Oct

- 1 tc trip via sp(s), sb(s) sa(s) us gulf with
  lawful/harmless
  merchandise, intention HSS(Corn) to  Libya

- redely dlosp 1 sp Med, intention Libya atdnshinc
  redely point not west of passero
- hire usd 32,500  pdpr inclot payable every 15 days
inadvce, 1st
  hire+bunkers  to be paid w/in 3 b/days

- sub cargo / trading exclusions  -- NO NEED VSL WILL BE
OCCUPIED FOR
  THE SPECIFIC TRADE ONLY

- sub agreeing bunkers

- ilohc: usd 4,400 incl dunnage/debris removal

- c/v/e: usd 1.500 per month/pro rata  --

- owns hereby authorize ACS GmbH to issue/sign/release
Bills of Lading
  in accordance with mate's receipt, marked 'payable as per
cp', prior
  release owners apprval to be obtained.

- BIMCO HAMBURG RULES CLAUSE for NYPE cp
  Neither the Charterers nor their Agents shall permit the
issue of any

bill of lading, waybill or other document evidencing a contract of
carriage (whether or not signed on behalf of the Owner or on the
Charterers' behalf or on behalf of any Sub-Charterers) incorporating the
Hamburg Rules or any other legislation giving effect to the Hamburg
Rules or any other legislation imposing liabilities in excess of Hague
or Hague/Visby Rules. Charterers shall indemnify the Owners against any
liability, loss or damage which may result from any breach of the
foregoing provisions of this clause.

- if original Bills of Lading not available upon vessel's arrival at
port of discharge, owns to release cargo against Letter of Indemnity in
owners
PandI club standard wording signed by chrts only.

- In case of vessel trading to Libya or Syria, owns to issue on their
letter head a certificate, stating that the a.m. vessel is not Israeli owned
and/or
controlled and has not called at any Israeli ports during this voyage.

- any war risk premiums on chartrs account

- English Law to apply, GA/Arbitration London, and as per lmaa
terms/conditions.

- Bimco ISPS and ism clause to apply

- Sub details on chrts exec nype cp
- 3.75 past us

- end recap


Best regards,

```
[Message sent via SOFTWAY Communication Program]
|
|CHAR_SET:
|=== MESSAGE ADDRESSEES
|To: ;
|    peroseal@OTENET.GR
|Cc: ;
|
|=== MESSAGE INFORMATION: [size: 4749 bytes] [0] [P]
|=== END
```

VON:                                    NUMMER:                    2006/08/31 14:34    S001

Tassos/Rui

regards




TOEPFER TRANSPORT

*Original*

# Time Charter

**GOVERNMENT FORM**
Approved by the New York Produce Exchange
November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party,** made and concluded in ............................ Hamburg, the 2nd............ day of February, 2006,......... 19........
2  Between Messrs. SEATRADE MARITIME CORP. of LIBERIA,......................................................................................................
3  Owners of the good ......... Greek flag .............. Steamship/Motorship "ATHENA" ............................................ of ...... See Clause 52 ..........
4  of .......................... tons gross register, and ................................. tons net register, having engines of .................... indicated horse power
5  and with hull, machinery and equipment in a thoroughly efficient state, and classed *A.B.S.* .............................................................
6  at .............................. of about ............................. cubic feet bale capacity, and about ..................................... tons of £240 lbs.
7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ships' deadweight capacity
8  allowing a minimum of fifty tons) on a draft of .............................. feet ............. inches on ............... Summer freeboard, inclusive of permanent bunkers,
9  which are of the capacity of about ...................................................................... tons of fuel, and capable of steaming, fully laden, under good weather
10 conditions about ...................... knots on a consumption of about ...................... tons of best Welsh coal—best grade fuel oil—best grade Diesel oil,
11 now trading, ..................................................................................................................................................................................
12 ...................................................................................................... Chatterers of the City of Valetta, Malta ..............................................
13 ................................... and *ATLANTIC ORIENT LINE LTD.* ............................................................................................................
14 **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
    about *one time/charter trip, via safe port/s, safe berth/s, safe anchorage/s, in/out geographical rotation via U.S. Gulf/Mississippi River*
15 *with lawful merchandise,     intention bulk grain/corn to Mediterranean Sea, including Syria. Vessel to be always afloat/always within*
   *Institute Warranty Limits, ................... within below mentioned trading limits.*
16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17 the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder.*
18 Vessel to be placed at the disposal of the Charterers, at *on arrival pilotstation SOUTH/WEST PASSAGE, any time 'daylights Sundays and*
   *Holidays included.* .......................................................................................................................................................................
19 in such dock or at such wharf or at such place (where she may safely lie—always afloat, at all times of tide, except as otherwise provided in clause No. 6) as
20 the Charterers may direct. If such dock, wharf or place be not available, time to count as provided for in clause No. 5. Vessel on her delivery to be
21 ready to receive cargo with clean-swept holds *See Clause 37* and tight, staunch, strong and in every way fitted for the service, having water ballast,
22 winches and
23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25 dise, excluding petroleum or its products, in proper containers, including intention bulk grain, corn, shm, soyabeans or other grain products.
26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number of—livestock at their risk,
27 all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North
28 America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or
29 Mexico, and/or South America, ...................................................................................................................................... and/or Europe
30 and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between
31 October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding, when out of season, White Sea, Black Sea and the Baltic,
32 *See Clause 49* ...............................................................................................................................................................................
33 ...............................................................................................................................................................................................

VON:                          NUMMER:                          2006/08/31 14:94    S002

as the Charterers or their Agents shall direct, on the following conditions:

34
35
36   1.   That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the
37   insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water *lubrication oil* and maintain her class
     and keep
38   the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.
39   2.   That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *customary Pilotages,*
     Agencies, *except agency fees charged for Owners' matters* Commissions,
40   Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41   a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42   illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43   charter to be for Charterers account *including shore accommodation and transportation of vessel's crew, if compulsory.* All other fumigations to
     ~~be for Charterers account after vessel has been on charter for a continuous period~~
44   ~~of six months or more~~
45   Charterers are to provide necessary dunnage ~~dunnage/kraft paper~~ ~~and shifting boards,~~ also any extra fittings requisite for a special trade or unusual cargo, but
46   Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47   for damage, they making good any damage thereto.
48   ~~3.   That the Charterers at the port of delivery and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49   ~~board the vessel at the current prices at the respective ports, the vessel to be delivered with not less than~~ _____
50   _____ ~~tons and not more than~~ _____ _____ ~~tons and not more than~~
51   _____ ~~tons and to be re-delivered with not less than~~ _____ _____ *see See Clause 43*
52   4.   That the Charterers shall pay for the use and hire of the said Vessel at the rate of US$ _____ *daily including overtime,* _____ *See also Clause 54*
     ~~capably, including overtime and~~
53   ~~money, on~~ _____ ~~Summer freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at _____ United States Currency ~~per ton on vessel's total deadweight carrying~~
54   and after the same rate for any part of a month day; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55   wear and tear excepted, to the Owners (unless lost) as *on dropping last outward seapilot 1 safe port SYRIA, port in Charterers;* any
56   *time day/night SHINC.* _____ unless otherwise mutually agreed. Charterers are to give Owners not less than 15/10/5/3
     days approximate.
57   notice of vessels expected date of re-delivery, and probable port *plus 4824 hours definite notices. Time computation at both ends to count*
     *GMT.*
58   5.   Payment of said hire to be made *to Owners' nominated bank* ~~in New-York~~ *in cash* ~~in-cash~~ in United States Currency, *within 2 (two) banking days*
     *after delivery, thereafter* ~~semi-monthly in advance,~~ *every 15 days in advance* and for the last half month or
59   part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60   due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61   hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62   terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~
63   ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
64   ~~to have the privilege of using vessel at once, such time used to count as hire.~~
65   Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents *provided*
     *Owners' written confirmation has been given,* subject
66   to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67   of such advances.
68   6.   That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* place that Charterers or their Agents may
69   direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such place where it is customary for similar size vessels to safely~~
     ~~lie aground.~~
70
71   7.   That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72   accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

VON:                                    NUMMER:                                    2008/08/31 14:84    S003

73  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodation allow. Charterers
74  paying Owners ........................... per day per passage for accommodation and meals. However, it is agreed that in case any fines or extra expense are
75  incurred in the consequence of the carriage of passengers, Charterers are to bear such related expense.
76      8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency, and Charterers are to load, stow, *discharge, lash and unlash, dunnage, secure, tally* and trim the cargo at their expense under the
79  supervision *and control* of the Captain, who is to sign Bills of Lading for
80  cargo as presented, in conformity with Mate's or Tally Clerk's receipts.
81      9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
82  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
83      10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel *at his own risk* and see that voyages are
84  prosecuted with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
     rate of $1.00 USD ▓▓▓ per day, Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual
     Tally
85  Clerks, Stevedore's Foremen, etc., Charterers paying USD ▓▓▓ at the current rate per meal, for all such victualling.
86      11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs abstracts, *in English* showing the course of the vessel and distance run
     and the con-
89  sumption of fuel.
90      12. That the Captain shall use diligence in caring for the ventilation of the cargo.                                               :    ·   ▓
91      13. That the Charterers shall have the option of continuing this charter for a further period of .........................
92  ................................................................................... days previous to the expiration of the first named term, or any declared option.
93  on giving written notice thereof to the Owners or their Agents .................................................................................. and should vessel
94      14. That if required by Charterers, time not to commence before *12th February, 2006 - 00:01 hours* .......................................
95  not have given written notice of cancelling this Charter at any time not later than the day of vessel's readiness.   but not later than 4 pm. Charterers or
96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97      15. That in the event of the loss of time from deficiency of men *Crew/Officers/Master including their smuggling/drug trafficking* or stores,
98  fire, breakdown or damages to hull, machinery or equipment,
     grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
     *whatsoever*
99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra *direct* expenses shall be deducted from the hire.
102     16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105     The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.
107     17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London according*
     *to English law New-York*,
108 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
     the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men *for disputed amounts not*
109 *exceeding US$ 50,000.00 both parties agree to Arbitration in London as per LMAA Small Claim Procedure as per current version.*
110     18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance but not earned, and any overpaid hire or excess

VON:                    NUMMER:                    2006/08/31 14:34    S004

112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113  might have priority over the title and interest of the owners in the vessel.
114  19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115  Crew's proportion. General Average shall be adjusted, stated and settled *in London*, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F
116  of York-Antwerp Rules 1924 *as amended 1990*, at such port or place in the United States as may be selected by the carrier, and as to matters not provided

117  for by these Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
118  United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
119  the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
120  bond and such additional security as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121  or his agents may deem sufficient as additional security to the contribution of the goods and for any salvage and special charges thereon, shall, if
122  required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
123  carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
124  place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
125  United States money.

126  In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,
127  whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract, or otherwise, the
128  goods, the shipper, and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
129  losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
130  goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
131  ships belonged to strangers. **Hire not to contribute to General Average**

132  Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.
133  20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves are to be agreed to as to quantity, and the
134  cost of replacing same, to be allowed by Owners.
135  21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
136  convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
137  time of last painting, and payment of the hire to be suspended until she is again in proper state for the service. *No drydocking except in case of*
138  *emergency.* ...............................................................................................................................................................

139
140  22. Owners shall maintain the gear of the ship to fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also
141  providing ropes, falls, slings and blocks *as on board*. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary
142  gear for

143  same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *sufficient electric light*
144  night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
145  Charterers to have the use of any gear on board the vessel.
146  23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging.
*Shore Crewmen to be paid by Charterers.* steamers to provide one winchman per hatch to work winches day and night, as required, Charterers
147  agreeing to pay efficient, proficient, winchmen. **The vessel is gearless.**
148  deck hands and donkeymen engineers, winchmen.
149  part, or labor unions, prevent crew from driving winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150  insufficient power to operate winches. Owners to pay for shore winches with the working hours and rates stated in the ship's articles. If the rules of the
151  thereby.

152  24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exceptions from liability contained
153  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels," etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
154  of which are to be included in all bills of lading issued hereunder.

VON:                    NUMMER:                    2006/08/31 14:34    S005

*Original*

U.S.A. Clause Paramount

155  ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved Apr~~
156  ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
157  ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
158
159  ~~be repugnant to said Act to any extent, such term shall be void to that extent but no further.~~
160
161      Both-to-Blame Collision Clause
162  ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
163  ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owner of the goods carrie~~
164  ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such los~~
165  ~~or liability represents loss of or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other carrying~~
166  ~~carrying ship or her owner to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or he~~
167  ~~owners as part of their claim against the carrying ship or carrier.~~
168  ~~25. The vessel shall not be required to enter any ice-bound port, or any port where lights on light ships have been or are about to be wit~~
169  ~~drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter th~~
170  ~~port or to go out after having completed loading or discharging.~~
171      26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for th
172  ~~navigation of the vessel, acts of tugboad/pilot, see Clause 55 insurance, crew, and all other matters, same as when trading for their own account.~~
173      27. A commission of 3.75 *3 1/2 per cent* total is payable by the Vessel and Owners to

*AUSTRIAN CHARTERING SERVICE GMBH, HAMBURG, including address commission plus 1.25% brokerage to TOEPFER*
*TRANSPORT LTD, HAMBURG plus 1.25% to EKKO CHARTERING LLC., Irvington, New York*
on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

174      28. An address commission of 2 1/2 per cent payable to ...................................... on the hire earned and paid under this Charter.
175

*Additional Clauses 29 to 67, both inclusive, are deemed to be fully incorporated in this Charter Party*

*All negotiations and fixture to be kept fully private and confidential between all parties.*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship
Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the
insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having
been made by the licensee or end user as appropriate and not by the author.

FOR AND ON BEHALF OF OWNERS

By

A.C.S. Austrian Chartering Service GmbH
Hamburg

**M/V "ATHENA "**
**Additional Clauses to the Charter Party dated 2nd February, 2006**

**CLAUSE 29:**
Owners/Master to give on fixing and 5/3/2 approximate days and 1 day definite notice to ACS, Linz (Telex Number 22 24 17 acs a, e-mail office@acs-linz.com) and Austrian Chartering Hamburg (Fax +49-40-337614, e-mail charter@acs-hamburg.de).

**CLAUSE 30:**
Should the vessel be off-hire for more than 7(seven) consecutive days Charterers shall have the option to cancel this Charter Party, however, vessel to be empty. Hire paid in advance but not earned to be immediately refunded by Owners.
Charterers take over the risk at discharging ports at Syria in line with usual P & I Club Interclub Agreement.

**CLAUSE 31:**
Charterers not to be held responsible for any damage to the vessel incurred during loading and discharging operations unless:
a)  The Master notifies Charterers and their Agents within 24 hours by telegram or in writing of any damage sustained by the vessel so that a claim can be made against the responsible party.

b)  The damage is specified in detectable detail and Charterers' Agents or Surveyor in the relative port are enabled to ascertain the damage, otherwise no notice shall be accepted.

c)  Stevedoring damages, if any, shall be immediately reported by Master directly to Stevedores upon occurrence in order to get signed evidence of the damage, as far as possible.

d)  Hidden damages, if any, to be reported by the Master upon discovery but not later than 24 hours after vessel's redelivery.

e)  Provided Master has complied with items a)-d) any damage affecting vessels seaworthiness and tradeworthiness including cranes to be repaired by Charterers prior to redelivery and vessel to remain on-hire.

**CLAUSE 32:**
Vessel to have Ship's Management (Master, Chief-Engineer) duly qualified, approved licensed, and all three persons to have good working knowledge of the English language.

**CLAUSE 33:**
Charterers or their Agents have the option of holding a superficial inspection of the vessel at any time and Owners/Master to give every facility and assistance in carrying out such superficial inspection, always accompanied by the Master and/or Chief Engineer.

**CLAUSE 34:**
Owners guarantee that the vessel is always safe in ballast with vessel's own ballast water ability.

Owners furthermore guarantee that the vessel is able to sail with slack and/or empty holds, partladen holds between ports at sea as per book and stability booklet.

Charterers are only responsible for damages covered by usual "Charterers Liability Insurance".

**CLAUSE 35:**
Owners warrant that the vessel is in possession of all Certificates of Efficiency of working equipment which to comply with the current requirements/regulations at all ports of call.
Owners furthermore warrant that the vessel has on board all documents/certificates required by relevant U.S. Authorities/Government Agencies for calling at U.S. ports, the Federal Maritime Certificate of Financial Responsibility (Oil Pollution) and that the vessel is eligible for bunkering in the U.S.A., also (for vessels built 1976 or later) the International Oil Pollution Prevention Certificate.
Vessel to be tendered free of beetles on delivery and Owners also to supply a valid Deratization Certificate.
In the event that any of the above mentioned certificates does not cover the whole period of the Charter all direct cost, losses etc. resulting from Owners' failure to produce such valid certificate to be for Owners' account and Charterers may suspend hire for the time thereby lost.

A.C.S. Austrian Chartering Service GmbH
Hamburg

## M/V "ATHENA"
### Additional Clauses to the Charter Party dated 2nd February, 2006

**CLAUSE 36:**
Extra insurance, if any, on vessel/cargo or due to vessel's class, flag or Ownership to be for Charterers' account against Owners original vouchers as per London market,
Basic war risk insurance and Crew bonus to be for Owners' account, however, in the event of any increase in war risk insurance premium and Crew bonus after delivery due to the trade in which vessel is engaged, same to be for Charterers' account until redelivery.
Extra premia to be paid by Charterers upon invoicing by Owners' insurance brokers.

**CLAUSE 37:**
Vessel's holds to be thoroughly cleaned and dried before delivery and must not be painted during Charter period without Charterers' permission.
Crew to assist whenever possible in cleaning holds after discharging operations or during ballast voyage(s).
Vessel to be redelivered with clean swept holds, however, Charterers have option to redeliver the vessel without cleaning against payment of USD 4,000.00. Stevedores to bring debris/dunnage to maindeck free of expense to Owners. Owners to remove same at their expense.

**CLAUSE 38:**
Charterers have the liberty to weld pad-eyes to vessel's hull, cargo holds or hatches for lashing and securing cargo and same to be removed prior redelivery at Charterers' time and expense including any cost for class surveyor.

**CLAUSE 39:**
Charterers have the liberty to retain sufficient funds from last sufficient hire payments in order to cover estimated bunkers remaining on board at the time of redelivery.

**CLAUSE 40:**
In the event hire has not been paid on the due date, Owners are to give Charterers 2 (two) days grace before having the power to exercise their rights hereunder. Owners also to give Charterers 24 (twenty-four) hours warning of their intention to exercise such rights.

**CLAUSE 41:**
It is guaranteed that vessel's hatchcovers are watertight. Hatches to be carefully tended by Crew to prevent leakage and Owners to provide sufficient tarpaulins which are to be used if and how deemed necessary for protection of cargo in case hatchcovers are not of McGregor type. Crew to undertake opening and closing of hatches at all times when and where required by Charterers. If same, however, is not permitted by local regulations/authorities shore labour to be employed at Charterers' expense and time. Vessel is guaranteed free of cargo battens and/or grainfittings.

**CLAUSE 42:**
deleted

**CLAUSE 43:**
Bunker Clause:
Bunkers on delivery to be expected about 380 metric tons IFO and about 145 metric tons MDO.
Bunkers on redelivery to be about same quantities as on delivery.
Bunker prices both ends USD 340.00 per metric ton IFO and USD 560.00 per metric ton MDO. Value of bunkers on delivery to be invoiced/paid together with first hire payment.

Owners have the option to bunker the vessel prior to redelivery provided bunkering does not interfere with Charterers operations.

**CLAUSE 44:**
Owners to authorize Austrian Chartering Service GmbH to sign/release Bills of Lading on Owners' behalf in strict conformity with Mate's Receipts however before signing copy of Bill of Lading, to be faxed to Owners for their approval. If original Bills of Lading are not available upon vessels arrival at discharging port, Owners are to release the cargo against a Letter of Indemnity as per Owners' P&I Club wording signed by Charterers only.
It is expressly agreed, that Charterers will not issue or cause to be issued Bills of Lading which are subject to the provisions of the Hamburg Rule.

A.C.S. Austrian Chartering Service GmbH
Hamburg

## M/V "ATHENA "
### Additional Clauses to the Charter Party dated 2nd February, 2006

**CLAUSE 44 – continued:**
Owners to authorise to sign/release "clean on board" Bills of Lading against Charterers' standard Letter of Indemnity with Owners' P&I Club wording, however, no bank guarantee is required.
The cargo quantity at loading and discharging ports will be determined by ships Officers and/or an independent cargo surveyor.

**CLAUSE 45:**
A joint on- and off-hire survey, to be held at first load respectively last discharge port. On-hire survey in Owners' time, off-hire survey in Charterers' time. Each party to appoint and pay his own surveyor. Owners have the right to appoint Master/Chief Engineer as their surveyor.

**CLAUSE 46:**
Any time lost, either in port or at sea, deviation from the course of the voyage or putting back whilst on voyage caused by sickness of or an accident to the Crew or any person on board the vessel other than persons travelling upon request of the Charterers or by reason of the refusal of the Master or Crew to perform their duties or due to an accident or breakdown to the vessel, the hire shall be suspended from the time of inefficiency in port or at sea, deviation or putting back until the vessel is again efficient in the same equivalent position whichever is the shorter distance to the port where the vessel is originally destined and the voyage resumed therefrom. All expenses incurred including bunkers consumed during such period of suspension shall be for Owners' account. In the event of time arising from arrest, governmental restrictions or boycott of the vessel by shorelabours and/or tugboats etc. by reason of vessel's flag or the terms and conditions on which crew members are employed or by reason of the trading of this or any other vessel under the same Ownership and/or operation and/or control payment of hire shall cease for the time thereby lost. Extra expenses, if any, resulting directly from such action to be for Owners' account.

**CLAUSE 47:**
Both parties have the option to cancel this Charter Party if war breaks out between any two or more of the following countries: Germany, People's Republic of China, U.S.A., United Kingdom, C.I.S. or the country where the vessel is registered respectively controlled.

**CLAUSE 48:**
Deleted.

**CLAUSE 49:**
**TRADING EXCLUSIONS**
Scandinavia, Serbia, Montenegro, Israel, Turkish occupied part of Cyprus, Cuba, Zaire, Angola, Australia, New Zealand, North and/or South Yemen, Commonwealth Independent States Pacific, North Korea, Cambodia, Haiti, Bangladesh, Sierra Leone, Liberia, Georgia including Abhazia, Somalia, Great Lakes, U.N. sactioned countries, Albania, Libya, ex Yugoslavia Republics – however Slovenia and Croatia are allowed, United Kingdom.

In case of vessel trading to Libya or Syria, Owners to issue on their letterhead a certificate, stating that the above mentioned vessel is not Israeli owned and/or controlled and has not called at any Israeli ports during this voyage.

**CLAUSE 50:**
The terms and conditions of this Charter Party are further subject to the Hague Rules contained in the International Convention for the unification of certain rules relating to Bills of Lading, dated Brussels, August 25th, 1924, as enacted in the country of shipment shall apply to this contract. When no such enactment is in force in the country of destination shall apply, but in respect of shipments to which no such enactments are compulsory applicable the terms of the said convention shall apply.
New Jason Clause, Both-to-Blame Collision Clause, Conwartime 93 and Paramount Clauses are deemed to be incorporated in this Charter Party but any cargo claims the provision of Clause 55 will overrule Bills of Lading stipulation.

**CLAUSE 51:**
Charterers have the privilege to place lighters, barges, coasters, bunkering barges, alongside vessel in which case Charterers to provide sufficient fenders to Masters' satisfaction.
The area used for lightening/top-off is to be a customary and usual safe area where such operations normally take place. If at any time Master considers unsafe to commence or continue with such operaton, he can either, at

A.C.S. Austrian Chartering Service GmbH
Hamburg

## M/V "ATHENA "
### Additional Clauses to the Charter Party dated 2nd February, 2006

CLAUSE 51 – continued;
his option, order the lightening/top-off vessel away from his vessel and such vessel/craft must obey his order or
he may remove his own vessel from alongside and time to count. Extra insurance or difference in increased
deductible, if any, for such operation to be for Charterers' account.

CLAUSE 52:
Vessel's description:
MV ATHENA, EX COOP GRANEL
'79 BLT GRK FL SD ST BC
DETAILS ALL ABOUTS
61,500 MT DWAT ON 12.42 MTR SSW
GT/NT 34636 / 19969
CLASSED ABS, 7/7 HOHA, MCGREGORS
LOA/BEAM: 224.5/32.2 MTR
HATCH SIZES: 1 - 16.10 X 13.2 M
              2/7 16.00 X 13.2 M
74,654.4GR
SPEED ABOUT 13K ON ABT 34 MT IFO 180 CST PLUS 3 MT MDO AVE L/B
IN PORT VSL BURNS 3 MT MDO
TPC : 62.98

DFT 39.5 FT TTFW - 56891 MT
WL/THC IN HEAVY BALLAST (NO 4 FLOODED) - 11.45M
CLASSED - ABS
PANDI CLUB - THE WEST OF ENGLAND FOR PANDI AND FD+D

- SPEED AND CONSUMPTION GIVEN ARE WARRANTED UPTO INCL B4 IN LADEN
CONDITIONS
VESSEL BURNS MDO IN MAIN ENGINE WHEN MANUEVERING IN/OUT OF PORT OR IN
SHALLOW/OR CONGESTED/CONFINED WATERAYS, CANALS RIVERS ESTATUARIES.
-----------
01) LEGAL NAME/ADDRESS/TLXNUMBER OF
    A) ORIGINAL OWS        - SEATREADE MARITIME CORP. OF LIBERIA
    B) MANAGERS            - BYZANTINE MARITIME, PIRAEUS
02) EX NAME               - COOP GRANEL
    CALL SIGN             - SXFQ
    TLX/FAX               - 423781810 ATHE
03) CLASS - ABS
    H + M VALUE .. - USD 10 MIO.
              UNDERWRITERS 50PCT ITALY/50PCT NORWAY
    OWNERS P AND I         - WEST OF ENGLAND
    UPON REQUEST, TLX CONFIRMATION FM P+I CLUB AND HULL/MACHINERY
04) LIGHTWEIGHT           - 11450 MT
    CONSTANTS             - ABT 700 MT ex fresh water.
05) INTERNATIONAL TONNAGE CERTIFICATE
    GT/NT         - 34636 / 19969
    PANAMA GRT/NRT        - 36440 / 26756
    SUEZ GT/NT            - 36131.72/ 31560.40
    VESSEL SUITABLE FOR TRANSIT BOTH SUEZ AND PANAMA CANALS - YES.
    LAST PANAMA CANAL TRANSIT - 1/99
06) MAIN ENGINE           - SULZER
    SPEED/CONS - ABT 13 KTS ON ABT 34MT(180 CST) + 3 MT MDO, AVE L/B.
    PORT CONSUMPTION - 3 MT MDO PER DAY.
    FUEL SPECS - IFO 180 CST RMF 180 IN ACCORDANCE WITH ISO 8217-2005.
MDO DMB IN ACCORDANCE WITH ISO 8217

07) TANK CAPACITY
    IFO - ABT 2545 MT      MDO - ABT 380 MT    FW - 200
08) FITTED WITH FW GENERATOR - OUTPUT - YES

Page 4 of 8

A.C.S. Austrian Chartering Service GmbH
Hamburg

M/V "ATHENA "
Additional Clauses to the Charter Party dated 2nd February, 2006
CLAUSE 52 – continued:
09) GRAIN CUBIC IN HOLDS - 2636323 CFT GRAIN
    CUBIC BREAKDOWN - 363445 / 380777 / 381307 / 377337 / 375724
            / 379930 / 377803  CFT GRAIN
    HATCHCOVERS TYPE - STEEL 'PAN' TYPE

    HATCHSIZES - 1/16.10 X 13.20 M, 2-7/16.00 X 13.20 M
    HEIGHT OF HOLDS UNDER HATCHCOVERS - 18.06 M
    DIST FM RAILING TO HATCH COVERS EACH SIDE - 8.63 M
    DIST FM FORE OF 1ST HOLD TO AFT OF LAST HOLD - 167 M
    HOLS HAVE NATURAL VENTILATION AND ARE NOT CO2 FITTED
10) ITF/AWL FITTED, SUITABLE FOR GRAB DISCHARGE. GRAIN FITTED IN
    ACCORDANCE WITh LATEST SOLAS REGULATIONS.
11) DWAT ON 39 FT SW - 58013 MT
        29 FT SW - 39264 MT
        30 FT FW - 39347 MT (TPI 153.34)
        31 FT FW - 41218 MT (TPI 153.87)
        32 FT FW - 43035 MT (TPI 154.46)
12) W/LINE TO TOP OF HATCH IN FULL BALL.INCL H.4  FLOODED - 11.45M
    W/LINE TO TOP OF HATCH IN FULL BALL.EXCL H.4  FLOODED - 13.25M
    HOLD NO. 4 IS BALLAST HOLD, ONLY THIS HOLD CAN BE BALLASTED.
    TTL BALLAST CAPACITY -
13) VESSEL STRENGTHENED FOR CARRIAGE OF HEAVY CARGOES HOLDS 2/4/6
    TANK TOP STENGTHS
14) BALLASTING/DEBALLASTING TIME 18 HOURS INC NBR 4 CGO HOLD
15)    HOLD DIMS        HATCH DIMS      FLOOR TO
    LENGTH X BREADTH*    LENGTH X BREADTH    HATCHCOAMING

| | HOLD DIMS LENGTH X BREADTH* | HATCH DIMS LENGTH X BREADTH | FLOOR TO HATCHCOAMING |
|---|---|---|---|
| 1) | 26.03 X 29.96 M | 16.10 X 13.20 M | 18.06 M |
| 2) | 23.25 X 31.56 M | "" "" "" | |
| 3) | 23.32 X 31.56 M | "" "" "" | |
| 4) | 22.95 x 31.56 M | "" "" "" | |
| 5) | 22.95 X 31.56 M | "" "" "" | |
| 6) | 23.10 X 31.56 M | "" "" "" | |
| 7) | 24.90 X 31.56 M | "" "" "" | |

NOTE:* DENOTES ALL BREADTHS AT THE MIDDLE OF HEIGHT BUT LESSER AT UPPER AND
    LOWER PART OF HOLD DUE TO TANK HOPPERS
16) BANKING DETS
    M AND T BANK OF MARYLAND
    25 SOUTH CHARLES STREET
    BALTIMORE, MARYLAND 21201
    FOR THE ACCOUNT OF SEATRADE MARITIME CORP.
    ACCOUNT NUMBER: 192-3628-3
    BANK ABA NBR: 052000113

CERTIFICATES:
1.CLASS        ISSUED:OCT 05TH,2004-EXPIRATION:APRIL 29TH,2009
2.SAF/EQUIPMENT   ISSUED:AUG 26TH,2004-EXPIRATION:APRIL 30TH,2009
3.SAF/CONSTRUCTION ISSUED:AUG 26TH,2004-EXPIRATION:APRIL 30TH,2009
4.SAF RADIO      ISSUED:AUG 26TH,2004-EXPIRATION:APRIL 30TH,2009
5.SAF MANGNT CERT ISSUED:OCT 02ND,2001-EXPIRATION:JULY 14TH,2006
6.DOC OF COMPL    ISSUED:FEB 11TH,2003-EXPIRATION:MAY  06TH,2008

PSC INSPECTIONS:
1.YUZHNY UKRAINE  SEPT 02ND,2004 (NO DEFICIENCES)
2.B.I.K IRAN    OCT 01ST,2004 (NO DEFICIENCES)
3.YUZHNY UKRAINE JAN 14TH,2005 (NO DEFICIENCES)
4.FLAG STATE INSPECTION:JAN 15TH,2005 (NO DEFICIENCES)

VON:                      NUMMER:                   2006/08/31 14:34    S011

A.C.S. Austrian Chartering Service GmbH
Hamburg

M/V "ATHENA"
### Additional Clauses to the Charter Party dated 2nd February, 2006

**CLAUSE 52 – continued:**
5.DAMMAM SAUDI ARABIA  FEB 05TH,2005 (NO DEFICIENCES)

ACCIDENTS IN LAST 2 YEARS - NONE
All details about

Charterers: ATLANTIC ORIENT LINE, VALETTA, MALTA

Charterers' DOMIZILE:
     ATLANTIC ORIENT LINE LTD.,
     170 OLD BAKERY STREET,
     VALETTA, MALTA

-MANAGING AGENTS:
     AUSTRIAN CHARTERING SERVICE GMBH
     STRASSBRAU 6
     A-4010 LINZ, AUSTRIA

**CLAUSE 53:**
Master and/or Crew to render following services, whenever required by Charterers.
Such service to be free of charge to Charterers

Master is:

a) to work out together with Charterers' Supercargo a mutually to be agreed safe stowage plan and the Master has to confirm by his counter-signature this final and binding stowage plan prior loading.

b) to follow strictly Charterers' voyage instructions, except in case of proven emergency as given in Clause 16, Lines 105 and 106.

c) to sign all relevant correct vouchers which are presented by port Agents.

d) Master to be fully aware and to comply with any calling procedures/regulations for calling U.S. ports.

Crew is:

a) to open and close vessel's hatchcovers.

**CLAUSE 54:**
In conformity with Clause 4, hire to be paid to:



**CLAUSE 55:**
Cargo claims to be settled according to latest Interclub Agreement dated May, 1984 or its latest amendements. Neither party shall settle individual claims in excess of US$ 500.00 per claim without having other parties consent, which not to be unreasonably withheld.

Page 6 of 8

A.C.S. Austrian Chartering Service GmbH
Hamburg

M/V "ATHENA "
Additional Clauses to the Charter Party dated 2nd February, 2006

**CLAUSE 56:**
Vessel to load grain products only except bulk rice for human consumption.
All cargo to be non-dangerous and loaded in accordance with IMO regulations.

**CLAUSE 57:**
General Average/Arbitration in London, English law to apply including LMAA small claims procedure for claims upto US$ 50,000,00.

**CLAUSE 58:**
deleted

**CLAUSE 59:**
If original Bills of Lading are not available upon vessel's arrival at discharge port, Owners are to release the cargo against a Letter of Indemnity as per Owners' P&I Club standard wording signed by Charterers only.
Letter of Indemnity to be accompanied by copies of original Bills of lading.

**CLAUSE 60:**
Deleted

**CLAUSE 61:**
Deleted

**CLAUSE 62:**
Charterers to pay Owners US$ ~~██████~~ per month or pro-rata lumpsum covering cables, communication, meals gratuities and victualling and same to be paid every 30 days.

**CLAUSE 63:**
Charterers have the right to fumigate vessel's holds prior commencement of loading, after completion of loading, during seavoyage and prior commencement of discharging at their time expense and risk including crew accommodation, if required.

**CLAUSE 64:**
ISM CLAUSE
DURING THE CURRENCY OF THIS C/P,THE OWNERS SHALL PROCURE THAT BOTH THE VESSEL AND "THE COMPANY"(AS DEFINED BY THE ISM CODE) SHALL COMPLY WITH THE REQUIREMNTS OF THE ISM CODE. UPON REQUEST THE OWNERS SHALL PROVIDE A COPY OF THE RELEVANT DOCUMENTS OF COMPLIANCE (DOC) AND SAFETY MANAGEMENT CERTIFICATE (SMC) TO THE CHARTERERS. EXCEPT AS OTHERWISE PROVIDED IN THIS C/P, LOSS, DAMAGE, EXPENSES OR DELAY CAUSED BY FAILURE ON THE PART OF THE OWNERS OR "THE COMPANY" TO COMPLY WITH THE ISM CODE SHALL BE FOR THE OWNERS ACCOUNT.

**CLAUSE 65:**
Owners to make their Owners' agency arrangements in all ports of call, however, Owners/Master may utilise the services of Charterers' agents at all ports of call for minor vessel's matters at no extra charge for the Owners. Charterers may only deduct from hire US$ 500.00 per port without Owners' authority. All other amounts should have been authorized by Owners.

A.C.S. Austrian Chartering Service GmbH
Hamburg

## M/V "ATHENA "
### Additional Clauses to the Charter Party dated 2nd February, 2006

**CLAUSE 66:**
**ISPS Clause for Time Charter Parties**

(a)   (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b)   (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**CLAUSE 67:**
Speed and consumption given for the vessel are based on good weather conditions. Good weather condition for this Charter Party means Beauforts 4 and Douglas Scale 3 for Sea State.

* * * * * * * * * * * * * * * *

# Exhibit B

TAB 2

**PEROSEA SHIPPING CO. S.A. PANAMA**

DATE: 12.12.2006

TO: Atlantic Orient Line, Valetta, Malta

**M/V EAGLE FINAL HIRE STATEMENT**

CP DATE: 16/10/2006
HIRE: $32,500.00 P/D

| ITEM No. | | PARTICULARS | | | | DEBIT | CREDIT | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | HIRE PERIOD: | From: | 10/20/06 23:00 | UTC | | | | | |
| | | To: | 12/6/06 11:40 | UTC | | | | | |
| 2 | DURATION: | Days | 46.527778 | $32,500.00 | | 1,512,152.78 | | | |
| | OFF-HIRE: | From: | | | | | | | |
| | | To: | | | | | | | |
| | | Days | 0.000000 | | | | 0.00 | | |
| | NET HIRE: | | 46.527778 | $32,500.00 | | 1,512,152.78 | | | |
| 3 | BALLAST BONUS | | | $0.00 | | | 0.00 | | |
| | TOTAL: | NET HIRE INCLUDING BALLAST BONUS | | | | 1,512,152.78 | | | |
| 4 | ADDRESS COMMISSION: | | 3.75% | | | | 56,705.73 | | |
| | BROKERAGE: | 1.25% (Owners Broker) | | | | | 0.00 | 18,901.91 | 14,273.81 |
| 5 | B.O.D | BUNKERS ON DELIVERY | | | | | | | |
| | | IFO | In M/T | 200.800 | $300.00 | 60,240.00 | | | |
| | | MGO | In M/T | 69.600 | $580.00 | 40,368.00 | | | |
| 6 | B.O.R. | BUNKERS ON REDELIVERY | | | | | | | |
| | | IFO | In M/T | 117.500 | $300.00 | | 35,250.00 | | |
| | | MGO | In M/T | 42.900 | $580.00 | | 24,882.00 | | |
| 6.1 | B.O.C | BUNKERS OVER CONSUMED | | | | | | | |
| | | IFO | In M/T | 0.0000 | | | | | |
| | | MGO | In M/T | 0.0000 | | | | | |
| 7 | CHRTR'S ITEMS: | At Load Port, Mobile, AL, USA | | | | 78,000.00 | | | |
| 7.1 | C/VE | | $1,500.00 PER MONTH | | | 2,326.39 | | | |
| 7.2 | ILOHC: | | $4,400.00 LUMPSUM | | | 4,400.00 | | | |
| 8 | OWNERS EXPENSES | | | | | | | | |
| | ADVANCES | | | | | | | | |
| | 1st Hire on | 25.10.2006 | | | | | 445,416.75 | | |
| | 2 nd Hire on | 08.11.2006 | | | | | 297,889.92 | | |
| | 3 rd Hire on | 22.11.2006 | | | | | 217,495.50 | | |
| | 4 th Hire on | 01.12.2006 | | | | | 109,625.38 | | |
| | 5 th Hire on | 06.12.2006 | | | | | 31,296.25 | | |
| | 6 th Hire on | 08.12.2006 | | | | | 49,161.07 | As per charterers info / not yet confirmed by owners' bank | |
| | | SUB TOTAL | | | | $1,689,487.17 | $1,259,742.80 | | |
| | BALANCE DUE TO OWNERS : | | | | | | 3430,744.57 | | |
| | | GRAND TOTAL | | | | $1,689,487.17 | $1,689,487.17 | | |

Please remit the above amount due to Owners to our Bank Account stated below:
Banking:
LAIKI Bank
63, Her. Polytechniou & Skouze
Piraeus Office - Greece
SWIFT: EPPBGRAA
Account Number:        004-101101-151
Account Holder:        CROLIER SHIPPING LTD
REF:                   M/V EAGLE - C/P 16/10/06

CORRESPONDENT BANK:

DEUTSCHE BANK TRUST COMPANY AMERICAS
NEW YORK, USA
60, Wall Street, New York,
NY 10005 - 2858, USA
SWIFT Address: BKTRUS33

PEROSEA SHIPPING CO SA

# Exhibit C

## DECLARATION OF ADRIAN D. CHADWICK

I, ADRIAN CHADWICK, declare as follows:

1.    I am an Assistant Solicitor with the firm of Waterson Hicks, 130 Fenchurch Street, London, England, which represents Crolier Shipping Ltd. ("Crolier Shipping") in arbitration proceedings pending in London between Crolier Shipping and Atlantic Orient Line Ltd. ("ATOR") concerning a charter party dated 16 October 2006 for the M/V EAGLE.

2.    I have personal knowledge of the facts stated herein and provide this declaration based upon my personal knowledge and involvement in the said arbitration.

3.    I provide this declaration in support of the application for an attachment which includes amounts for the attorney fees and costs in connection with the London arbitration and interest.

4.    As provided for by English law and arbitration, attorneys fees are awarded to the successful litigant, along with costs, disbursements, the costs of the arbitration, and interest.

### Part One: Accrued Fees and Costs

5.    The following individuals are working on the subject proceedings in London:

> (a) Partner – J.W.Hicks – Sterling £295.00 per hour
> (b) Assistant Solicitor – A. Chadwick – Sterling £220.00 per hour
> (c) Costs Manager – N.McMeekin – Sterling £150.00 per hour



6.     Through December 21, 2007, the following costs and fees (stated in GBP) have been incurred by and on behalf of Crolier Shipping in regards to the London arbitration:

| Description | Amount (£) |
|---|---|
| **(i)    Attendances on the Claimants** | |
| (a)    Partner engaged 11 hrs 24 minutes | 3,363.00 |
| (b)    Assistant Solicitor engaged 4 hours | 880.00 |
| | |
| **(ii)    Attendances on the Respondents/Other Parties** | |
| | |
| (a)    Partner engaged 54 minutes | 265.50 |
| (b)    Assistant Solicitor engaged 2 hrs 54 minutes | 638.00 |
| | |
| **(iii)    Work on Documents/Submissions** | |
| (a)    Partner engaged 4 hrs 06 minutes | 1,209.50 |
| (b)    Assistant Solicitor engaged 13 hours 42 minutes | 3,014.00 |
| (c)    Costs Manager engaged 1 hour | 150.00 |
| | |
| Total Fees: | 9,520.00 |
| | |
| **Disbursements:** | |
| Arbitrator's Appointment Fee | 125.00 |
| | |
| **Total Fees and Costs Incurred to Dec. 21, 2007** | **9,645.00** |

**Part Two:  Anticipated Fees and Costs to Completion**

7.     I estimate that the anticipated costs to be incurred in the arbitration until conclusion are as follows:

| Description | Amount (£) |
|---|---|
| **(i)    Attendances on the Claimants** | |
| (a)    Partner engaged 2 hours | 590.00 |
| (b)    Assistant Solicitor engaged 6 hours | 1,320.00 |
| | |
| **(ii)    Attendances on the Respondents** | |
| (b)    Assistant Solicitor engaged 3 hours | 660.00 |

2



| | | |
|---|---|---:|
| **(iii)** | **Attendances on Tribunal/Counsel/Experts** | |
| (b) | Assistant Solicitor engaged 5 hours | 1,100.00 |
| | | |
| **(iv)** | **Work on Documents** | |
| (a) | Partner engaged 10 hours | 2,950.00 |
| (b) | Assistant Solicitor engaged 40 hours | 8,800.00 |
| (c) | Costs Manager engaged  2 hrs 30 minutes | 375.00 |
| | | |
| **(v)** | **Attending Hearing (I Day Estimate)** | |
| (a) | Partner engaged an estimated 6 hrs | 1,770.00 |
| (b) | Assistant Solicitor engaged an estimated 6 hrs | <u>1,320.00</u> |

Total Estimated Fees: 18,885.00

**Estimated Disbursements:**
Counsel's Fees – Brief of Hearing      5,000.00
Expert's Fees on Speed & Consumption claim      2,000.00

Total Estimated Fees and Costs: <u>**25,885.00**</u>

### Summary of Fees and Costs

8.      Thus, in sum, the total of the fees and costs incurred to December 21, 2007, and the estimated fees and costs to trial of the claim against Atlantic Orient in the London arbitration are as follows, stated in GBP and USD using an exchange rate of 1.98330:

| | (£) | ($) |
|---|---:|---:|
| Part One – Costs incurred to date | 9,645.00 | 19,128.93 |
| Part Two – Estimated Costs to Trial | <u>25,885.00</u> | <u>51,337.72</u> |
| Total: | <u>35,530.00</u> | <u>70,466.65</u> |

### Interest

9.      The anticipated time for completion of the proceedings in London from commencement is three years, and the current rate of pre-judgment interest that is usually awarded in London arbitration is 6.5% per annum compounded quarterly.



10. Thus, on a principal claim of USD $430,744.57, the amount of interest anticipated to be awarded is $91,924.16 based upon an interest rate of 6.5% per annum compounded quarterly and a period of 3 years.

11. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___28___ of ___December___, 2007.

_____
ADRIAN CHADWICK

4